IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-2147

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

ROBERT BRIAN WATSON and WDC HOLDINGS LLC d/b/a NORTHSTAR COMMERCIAL PARTNERS

     Defendants.

---

## COMPLAINT

---

Plaintiff United States Securities and Exchange Commission ("SEC"), for its Complaint against R. Brian Watson and Defendants WDC Holdings LLC d/b/a Northstar Commercial Partners ("Northstar" and together, "Defendants") alleges as follows:

### SUMMARY OF ALLEGATIONS

1.    R. Brian Watson and Northstar deceived investors in real estate projects by falsely promising that they would invest their own money alongside that of other investors. A co-investment from Defendants, who managed the projects, would create a significant monetary incentive for Defendants to maximize profits and avoid losses on each project that would align with investors' own financial interest in the projects. These promises were critical to investors to ensure that Defendants had "skin in the game" and held substantial interests aligned with their own.

2.       Defendants misled investors to raise approximately $49.5 million from at least 350 investors to fund ten separate commercial real estate projects ("Relevant Projects") through eleven securities offerings from April 2017 to August 2019 ("Relevant Period"). Defendants stated that they would supply 4%-5% of the needed equity for the Relevant Projects, an amount that would have totaled approximately $2.8 million.

3.       Despite Defendants' repeated representations that they would co-invest, they made no equity investment at all for eight of the Relevant Projects, and invested only a small fraction of the amount promised for two others. Investors incurred substantial losses in many of these projects – losses that Defendants avoided because they never invested the money they told investors they would contribute.

4.       As a result of the conduct described herein, Defendants have violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a)(2), and Section 10(b) of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5(b). In the alternative, Watson violated and, unless restrained and enjoined, will continue to violate Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) as a control person for Northstar's violations of the Exchange Act, and unless restrained and enjoined, Watson will continue to aid and abet Northstar's violations of the Securities Act and Exchange Act.

5.       The SEC brings this action under the authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §§ 78u(d)]. The SEC seeks permanent injunctions against each of the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this

Complaint and from violating, directly or indirectly, the laws and rules alleged in this Complaint; disgorgement of all ill-gotten gains from each of the Defendants from the unlawful activity set forth in this Complaint together with prejudgment interest; civil penalties pursuant to Section 21(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 20(d) of the Exchange Act [15 U.S.C. § 78u(d)] against each Defendant. The SEC seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## DEFENDANTS

6.    **R. Brian Watson** is a resident of Englewood, Colorado. Watson is the founder and chief executive officer ("CEO") of Northstar. Through limited liability companies he owned and controlled, he is Northstar's sole owner. Watson manages Northstar's overall business, investment strategies, and all major investment decisions. Watson has been a licensed real estate broker for nearly thirty years.

7.    **WDC Holdings, LLC d/b/a Northstar Commercial Partners** is a privately-held commercial real estate development company founded in 2000. It is a Colorado Limited Liability Company headquartered in Denver, Colorado.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action under Section 22(b) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27(a) of the Exchange Act, [15 U.S.C. § 78aa(a)], as well as Sections 20(b), 20(d)(1) of the Securities Act [15 U.S.C. § 77t(b), (d)(1)], and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d)-(e)].

9.    Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and

78aa]. Throughout the Relevant Period, Defendant Northstar was a Colorado Limited Liability Company headquartered in Denver, Colorado, and Defendant R. Brian Watson resided in the Denver metropolitan area. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the District of Colorado. For example, the false and misleading statements identified in this Complaint were made in, among other places, this district, and investors in this district received the false and misleading statements when making investment decisions.

## FACTS

I.   **Background**

   A.   **Northstar's Formation and Operations**

10.   Watson has years of experience working in real estate. Watson left his position with a commercial real estate firm and formed Northstar in 2000.

11.   Northstar's core business was the acquisition of commercial real estate assets, such as office buildings and light industrial properties, which were often distressed or vacant properties in need of improvement. Northstar's business plan was to improve the property after acquisition, lease it to tenants, and ultimately sell the improved property.

12.   During the Relevant Period, Northstar also engaged in ground-up development projects where it managed the design, construction, leasing, and sale of properties that were undeveloped at the time of acquisition.

13.   Northstar acquired or developed at least 150 real estate assets since 2000. In early 2020, Northstar had approximately 40 employees.

14.     Throughout Northstar's existence, Watson had control over all significant decision making by Northstar, had ultimate authority over all written materials published by Northstar, and personally signed every check Northstar issued.

15.     Throughout the Relevant Period, Watson and Northstar, directly or indirectly, received fees from each real estate project, including the Relevant Projects. These fees included, among others, property management fees and debt guarantee fees. Watson, as sole owner of Northstar, took distributions from Northstar.

16.     During the Relevant Period, Watson purchased a private jet, a multi-million dollar mansion, and a multi-million dollar house on a ranch.

17.     At the same time, during the Relevant Period, Northstar consistently was short of cash. As a result, Watson repeatedly contributed money back to Northstar to make payroll and cover operating expenses that Northstar could not otherwise pay.

**B.     Northstar's Business Model**

18.     During the Relevant Period, Northstar followed an industry-standard debt-financed transaction model when structuring each project, including the Relevant Projects. When Northstar identified an asset to acquire, its financial planning team developed a model that incorporated the cost of planned improvements and the targeted return on the investment. Based on these inputs, the model calculated a total project price, and Watson and Northstar determined a debt-to-equity ratio they believed the capital markets would support.

19.     Watson and Northstar then secured equity funding. To do so, Defendants solicited equity investors, who typically invested between $25,000 and $100,000 (the "Common Equity") for each specific project. For certain projects, Northstar and Watson also worked with senior

capital partners who received preferred returns and influence over project decision making in exchange for multi-million dollar investments.

20.     Defendants also secured debt for their projects.

21.     Northstar created a project-specific limited liability company ("LLC") for each project. Senior capital partners held "class A" interests in the project's LLC, and Common Equity investors acquired nonmanagerial, "class B" interests in each project's LLC. As holders of nonmanagerial interests, the Common Equity investors did not manage the projects and relied on the work of others for their expectation of profits.

22.     Northstar managed the LLCs.

23.     Northstar managed each project and supervised the project's development.

24.     At the conclusion of a project, Defendants would work to sell the asset. To the extent funds were available, Defendants then repaid creditors, returned initial capital to Common Equity investors, and distributed remaining cash to all investors according to a waterfall schedule set at the time of the initial investments.

## II.     Defendants' Solicitation of Common Equity Investors

25.     Throughout the Relevant Period, Northstar, through Watson and others at Watson's direction, solicited Common Equity investors for real estate projects, including the Relevant Projects.

26.     Defendants maintained a contact list of potential investors based on past projects, professional connections, and Watson's personal network.

27.     Defendants sent marketing emails for the projects through Northstar's online investor portal.

28.     Watson approved marketing materials and sent those marketing materials in emails to potential investors from his own Northstar email account.

29.     On behalf of Northstar, Watson personally called potential investors to solicit Common Equity investments in projects, often spending several hours a day on the phone with potential investors.

30.     The primary marketing material Defendants used to solicit Common Equity investors was a 10-20 page document called an Executive Investment Summary ("Summary").

31.     For each project, the Summary described the asset, its surrounding market, and Northstar's plan for development and improvement of the asset. The Summary also included a financial model showing the debt and equity structure, projected returns, and waterfall schedule for disposition of proceeds from the eventual sale of the asset. The Summary told investors that Watson was the founder and CEO of Northstar.

32.     Each Summary was prepared by Northstar employees prior to Defendants' solicitation of Common Equity investors.

33.     Watson reviewed and approved each Summary before it was distributed to potential Common Equity investors.

34.     Watson and Northstar disseminated Summaries for the Relevant Projects.

35.     Common Equity investors received the Summary either directly from Defendants or through Northstar's online investor portal by clicking hyperlinks in marketing emails.

36.     When potential Common Equity investors indicated investment interest in a project, Watson and Northstar provided them with a Private Placement Memorandum ("PPM"), either directly or through an electronic investor portal.

37.     The PPM described the terms of the investment, including fees payable to Defendants and others, and attached the operating agreement of the project entity, an accredited investor questionnaire, and a subscription agreement. Some PPMs also attached the Summary for the offering. Common Equity investors participated in a project by executing a subscription agreement, completing an accredited investor questionnaire, and sending funds to the bank account of the project-specific LLC entity.

38.     For each project, including the Relevant Projects, Defendants offered and sold LLC membership interests in project-specific companies.

39.     By purchasing LLC membership interests for each of the Relevant Projects, Common Equity investors invested money in a common enterprise, had no rights or power to direct the LLC's activities, and were entirely reliant on others to generate returns.

40.     The LLC membership interests offered and sold by Defendants are "securities" as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78c(a)(10)].

41.     For each of the Relevant Projects, Northstar filed a Form D for a Rule 506(c) unregistered offering of securities.

**III.    Defendants Made Materially False and Misleading Statements to Investors and Prospective Investors in Connection with the Offerings for the Relevant Projects.**

**A.    Defendants Made False and Misleading Statements**

42.     Defendants made the following false and misleading statements regarding investment in the Relevant Projects.

### i. **False and Misleading Statements Across all Relevant Projects**

43.     When offering and selling securities to fund the Relevant Projects, Watson and Northstar, through Watson, made numerous written and oral material false and misleading statements and omissions regarding Defendants' investments in the Relevant Projects.

44.     At all times relevant to Defendants' solicitation of investors for the Relevant Projects, it was an industry standard and therefore expected by investors that a real estate project's sponsor, like Northstar, its principals, or both, would make an investment in a project that it managed.

45.     In 2017, Northstar, through Watson and others under his control, disseminated a marketing brochure to potential investors, including by email dated July 26, 2017. Watson and others working at Watson's direction prepared the brochure. The brochure stated that Watson "invests his personal capital in every acquisition of the company. Such personal commitment in the investment process helps align the interests of the company with the long-term profit objectives of outside capital partners."

46.     Through at least 2018, Watson sent thousands of marketing emails to potential Common Equity investors that invited them to become "co-capital partners, alongside of my personal funds." Investors received these emails prior to investing.

47.     During the Relevant Period, Watson routinely made telephone solicitations to potential investors in the Relevant Projects. During these telephone calls, Watson routinely told investors that he put his personal funds into each project.

    ii.  **Additional False and Misleading Statements Regarding Naperville Project**

48.    In early 2017, Defendants solicited Common Equity investors for a project to construct a building for a day care operator in Naperville, Illinois (the "Naperville Project").

49.    Defendants prepared and distributed to potential investors a Summary for the Naperville Project dated February 6, 2017. Among other things, the Naperville Project Summary:

    a.    Stated "[Northstar] is currently accepting equity partners" in the project;

    b.    Stated "Northstar is currently accepting investment partners" in the project; and

    c.    Included a table for the equity side of the Naperville Project that showed "[Northstar] Co-Invest (5.00%) $61,590" and "Equity Draws" for Northstar of $61,590.

50.    On April 13, 2017, Watson, acting for himself and for Northstar, sent marketing emails to potential investors for the Naperville Project and other projects that stated Northstar was "currently accepting co-capital partners, alongside of my personal funds."

51.    Watson and Northstar provided the February 2, 2017 Naperville Project PPM to potential investors. The PPM attached a copy of the February 6, 2017 Summary as Exhibit A, incorporating the same statements described above.

52.    Between February 2017 and April 2017, Northstar raised approximately $1.24 million in Common Equity from at least twelve investors.

53.    Northstar's and Watson's statements about their co-investment in the project were false and misleading. Neither Northstar nor Watson invested the $61,590 that the Summary

stated they would invest. Instead, Watson and another individual associated with Northstar contributed only approximately $10,000 in equity to the Naperville Project.

54.     Defendants never informed Common Equity investors that Defendants failed to make the equity investment set forth in the Summary.

### iii.   Additional False and Misleading Statements Regarding Lakewood Project

55.     In mid-2017, Defendants solicited Common Equity investors for a project to acquire and redevelop a distressed, vacant office building in Lakewood, Colorado (the "Lakewood Project").

56.     Defendants prepared and distributed to potential investors a Summary for the Lakewood Project dated July 28, 2017. Among other things, the Wadsworth Project Summary:

  a.   Stated Northstar was presenting an "opportunity to co-invest alongside Northstar";

  b.   Stated "Northstar is accepting an equity partner(s) for this investment"; and

  c.   Included a table for the equity side of the Wadsworth Project that showed "[Northstar] co-invest (5.00%) $364,943" and "Equity Draws" for Northstar of $364,943.

57.     On July 26, 2017, Watson sent a blast of marketing emails for the Lakewood Project and others that stated Northstar was "currently accepting co-capital partners, alongside of my personal funds."

58.     The August 3, 2017 Lakewood Project PPM attached a copy of the July 28, 2017 Summary as Exhibit A, incorporating the same statements described above.

59.     Between May 2017 and October 2017, Northstar raised approximately $7.4 million in Common Equity from at least 22 investors for this project.

60.     Northstar's and Watson's statements about their co-investment in the project were false and misleading. Defendants contributed no equity to the project.

61.     Defendants never informed Common Equity investors that Defendants failed to make the equity investment set forth in the Summary.

62.     In 2019, Watson converted certain loans, deferred fees, and other monies into approximately $400,000 of equity in the project after the project's lender, who previously believed Watson contributed 5% of the equity in 2017, demanded Watson make the promised equity investment. Defendants did not inform Common Equity investors that Defendants had not previously invested or the reason why the 2019 conversion occurred.

63.     At the time they told investors in the Lakewood Project that they would co-invest, Defendants knew that they had made similar statements about co-investing in preceding offerings and had not made such investment. Defendants did not inform investors in the Lakewood Project that this had occurred.

### iv.  <u>Additional False and Misleading Statements Regarding Broomfield Project</u>

64.     In mid-2017, Defendants solicited Common Equity investors for a project to develop new warehouse space on a site in Broomfield, Colorado ("Broomfield Project").

65.     Defendants prepared and distributed to potential investors a Summary for the Broomfield Project dated June 26, 2017. Among other things, the Broomfield Project Summary:

> a.     Stated Northstar was presenting an "opportunity to invest with an affiliate of Northstar'";

      b.     Included a table for the source of funds for the equity side of the Broomfield Project stating "[Northstar] Co-Invest (4%) $500,000"; and

      c.     Included "Equity Assumptions" that stated "[Northstar] Co-Invest (4%) $500,000[.]"

66.     The June 21, 2017 Broomfield Project PPM attached a copy of the June 26, 2017 Summary as Exhibit A, incorporating the same statements described above.

67.     On July 26, 2017, Watson sent a blast of marketing emails for the Broomfield Project and others that stated Northstar was "currently accepting co-capital partners, alongside of my personal funds."

68.     Between June 2017 and October 2017, Northstar raised approximately $5.9 million in Common Equity from at least 50 investors for this project.

69.     Northstar's and Watson's statements about their co-investments in the project were false and misleading. Defendants and their affiliates contributed no equity to the project prior to 2019.

70.     Defendants never informed Common Equity investors that Defendants and their affiliates had not made the equity contribution set forth in the Summary.

71.     In 2019, Defendants converted certain loans into equity in the project. Defendants did not inform Common Equity investors that Defendants had not previously invested or the reason why the 2019 conversion occurred.

72.     At the time they told investors in the Broomfield Project that they would co-invest, Defendants knew that they had made similar statements about co-investing in preceding

offerings and had not made such investment. Defendants did not inform investors in the Broomfield Project that this had occurred.

### v. <u>Additional False and Misleading Statements Regarding Chicago Project</u>

73.     In mid-2017, Defendants solicited Common Equity investors for a project to construct a building for a daycare operator in North Chicago, Illinois (the "Chicago Project").

74.     Defendants prepared and distributed to potential investors a Summary for the Chicago Project dated August 7, 2017. Among other things, the Chicago Project Summary:

       a.    Stated in two places that Northstar was "currently accepting equity partners" for the project;

       b.    Included a table for the equity returns for the project that showed equity contributions from "Sponsor [Northstar] 5.0% $43,742;" and

       c.    Included "Equity Assumptions" that stated "[Northstar] Co-Invest (5.00%) $43,742[.]"

75.     Between August 2017 and September 2017, Northstar raised approximately $875,000 in Common Equity from two investors for this project.

76.     Northstar's and Watson's statements about their co-investment in the project were false and misleading. Defendants contributed no equity to the project.

77.     Defendants never informed Common Equity investors that they had not made the equity contribution set forth in the Summary.

78.     At the time they told investors in the Chicago Project that they would co-invest, Defendants knew that they had made similar statements about co-investing in preceding

offerings and had not made such investment. Defendants did not inform investors in the Chicago Project that this had occurred.

**vi.** **Additional False and Misleading Statements Regarding Rockford Project**

79.     In mid-2017, Defendants solicited Common Equity investors for a project to construct a building for a daycare operator in Rockford, Illinois (the "Rockford Project").

80.     Defendants prepared and distributed to potential investors a Summary for the Rockford Project dated August 3, 2017. Among other things, the Rockford Project Summary:

a.     Stated an entity formed by Northstar was "currently accepting equity partners" for the project;

b.     Stated Northstar was "currently accepting investment partners" for the project;

c.     Included a table for the equity returns for the project that showed equity contributions from "Sponsor [Northstar] 5.0% $45,184;" and

d.     Included "Equity Assumptions" that stated "[Northstar] Co-Invest (5.00%) $45,184[.]"

81.     On July 29, 2017, Watson sent a marketing email for projects, including the Rockford Project, that stated, "We are currently accepting co-capital partners, alongside of my personal funds…."

82.     Between August 2017 and September 2017, Northstar raised approximately $910,000 in Common Equity from two investors.

83.     Northstar's and Watson's statements about their co-investment in the project were false and misleading. Defendants contributed no equity to the project.

84.     Defendants never informed Common Equity investors they had not made the equity contribution set forth in the Summary.

85.     At the time they told investors in the Rockford Project that they would co-invest, Defendants knew that they had made similar statements about co-investing in preceding offerings and had not made such investment. Defendants did not inform investors in the Rockford Project that this had occurred.

### vii.   Additional False and Misleading Statements Regarding Phoenix Project

86.     In mid-2017, Defendants solicited Common Equity investors for a project to construct a commerce center in Phoenix, Arizona ("Phoenix Project").

87.     Defendants prepared and distributed to potential investors a Summary for the Phoenix Project dated August 10, 2017. Among other things, the Phoenix Project Summary:

a.      Stated "[t]his is an opportunity to co-invest alongside Northstar";

b.      Stated that the investment would "provide Northstar and its capital partners" with the underlying asset;

c.      Stated that "Northstar is accepting a capital partner(s)" for the investment;

d.      Included a table of "Equity Structure" that showed a "Pro Rata" return of "5.00%" for Northstar;

e.      Included "Equity Assumptions" that stated "[Northstar] Co-Invest (5.00%) $272,427"; and

f.      Included "Equity Draws" that stated "272,427" for Northstar.

88.     On July 26, 2017, Watson sent a marketing email for projects, including the Phoenix Project, that stated "We are currently accepting co-capital partners, alongside of my personal funds…."

89.     Between August 2017 and October 2017, Northstar raised approximately $5.7 million in Common Equity from at least 58 investors.

90.     Northstar's and Watson's statements about their co-investment in the project were false and misleading. Defendants contributed no equity to the project.

91.     Defendants never informed Common Equity investors that they had not made the equity contribution set forth in the Summary.

92.     At the time they told investors in the Phoenix Project that they would co-invest, Defendants knew that they had made similar statements about co-investing in preceding offerings and had not made such investment. Defendants did not inform investors in the Phoenix Project that this had occurred.

        viii.   **Additional False and Misleading Statements Regarding Aurora Project**

93.     In 2017 and 2018, Defendants solicited Common Equity investors for a project to construct a mixed-use development for veterans in Aurora, Colorado ("Aurora Project").

94.     Defendants prepared and distributed to potential investors a Summary for the Aurora Project dated August 2, 2017. Among other things, this Summary:

        a.      Stated "[t]his is an opportunity to co-invest alongside Northstar";

        b.      Stated that the project was "structured to offer to investors the opportunity to partner with Northstar to make a significant impact on the community";

        c.      Stated "Northstar is currently accepting capital partner(s)" for the project;

      d.      Included two separate tables of "Equity Structure" that showed a "Pro Rata" return of "5.00%" for Northstar; and

      e.      Included "Equity Draws" that showed "356,347" for Northstar.

95.      Defendants prepared and distributed to potential investors another Summary for the Aurora Project dated December 15, 2017. Among other things, this Summary:

      a.      Stated "[t]his investment has been structured to offer investors the opportunity to co-invest alongside Northstar to make a significant impact on the community;"

      b.      Included two separate tables of "Equity Structure" that showed a "Pro Rata" return of "5.00%" for Northstar; and

      c.      Included "Equity Draws" that showed "410,417" for Northstar.

96.      Defendants prepared and distributed to potential investors another Summary for the Aurora Project dated April 6, 2018. Among other things, this Summary:

      a.      Stated that the project "offers investors the opportunity to co-invest alongside Northstar";

      b.      Included a table of "Equity Structure" that showed a "Pro Rata" return of "5.00%" for Northstar; and

      c.      Included "Equity Draws" that showed "323,174" for Northstar.

97.      On July 29, 2017, Watson sent a marketing email for projects, including the Aurora Project, that stated "We are currently accepting co-capital partners, alongside of my personal funds…."

98.     Between October 2017 and July 2018, Northstar raised approximately $6.1 million in Common Equity from at least 66 investors for this project.

99.     Northstar's and Watson's statements about their co-investment in the project were false and misleading. Defendants contributed no equity to the project.

100.    Defendants never informed Common Equity investors that they had not made the equity contribution set forth in the Summaries.

101.    At the time they told investors in the Aurora Project that they would co-invest, Defendants knew that they had made similar statements about co-investing in preceding offerings and had not made such investment. Defendants did not inform investors in the Aurora Project that this had occurred.

### ix.  Additional False and Misleading Statements Regarding Lafayette Project Phase 1

102.    In late 2017, Defendants solicited Common Equity investors for a project to construct a medical office building in Lafayette, Colorado ("Lafayette Project Phase 1").

103.    Defendants prepared and distributed to potential investors a Summary for the Lafayette Project Phase 1 dated September 1, 2017. Among other things, this Summary:

      a.     Stated "[t]his is an opportunity to co-invest alongside Northstar";

      b.     Included "Equity Assumptions" that showed "[Northstar] Co-Invest (5.00%) $186,825"; and

      c.     Included "Equity Contributions" that showed "[Northstar] 5.0% $186,285[.]"

104.    On July 29, 2017, Watson sent a marketing email for projects, including the

Lafayette Project Phase 1 that stated, "We are currently accepting co-capital partners, alongside

of my personal funds…."

105.    Between September 2017 and November 2017, Northstar raised approximately

$1.65 million in Common Equity from at least 23 investors for this project.

106.    Northstar's and Watson's statements about their co-investment in the project were

false and misleading. Defendants contributed no equity to the project.

107.    Defendants never informed Common Equity investors that they had not made the

equity contribution set forth in the Summary.

108.    At the time they told investors in the Lafayette Project Phase 1 that they would

co-invest, Defendants knew that they had made similar statements about co-investing in

preceding offerings and had not made such investment. Defendants did not inform investors in

the Lafayette Project Phase 1 that this had occurred.

        **x.**  **Additional False and Misleading Statements Regarding Lafayette**
              **Project Phase 2**

109.    In 2018 and 2019, Defendants solicited Common Equity investors for the second

phase of the project to construct a medical office building in Lafayette, Colorado ("Lafayette

Project Phase 2").

110.    Defendants prepared and distributed to potential investors a Summary for the

Lafayette Project Phase 2 dated June 15, 2018. Among other things, this Summary:

        a.     Stated "[t]his is an opportunity to invest with Northstar";

        b.     Included "Equity Assumptions" that showed a "[Northstar] Co-Invest

             (5.00%) $205,858;

   c.  Included a table of "Equity Structure" that showed a "Pro Rata" return of "5.00%" for Northstar; and

111. Watson knew that the Summary did not accurately convey Defendants' intent to invest. In a July 26, 2018, email, Watson told a Northstar employee that raised this issue that, "As stated to you before, we should not state that we are contributing 5%. We should state that we may contribute up to 5%, or don't mention it at all would be my preference."

112. Between August 2018 and February 2019, Northstar raised approximately $4.8 million in Common Equity from at least 49 investors for this project, including investors who rolled over equity from the Lafayette Project Phase 1.

113. Northstar's and Watson's statements about their co-investment in the project were false and misleading. Defendants contributed no equity to the project.

114. Defendants never informed Common Equity investors that they had not made the equity contribution set forth in the Summary.

115. At the time they told investors in the Lafayette Project Phase 2 that they would co-invest, Defendants knew that they had made similar statements about co-investing in preceding offerings and had not made such investment. Defendants did not inform investors in the Lafayette Project Phase 2 that this had occurred..

    xi. **Additional False and Misleading Statements Regarding Vista Project**

116. In early 2019, Defendants solicited Common Equity investors for a project to purchase and improve a senior living facility in Vista, California ("Vista Project").

117. Defendants prepared and distributed to potential investors a Summary for the Vista Project dated January 25, 2019. Among other things, this Summary:

a.   Stated "[t]his is an opportunity to co-invest alongside Northstar";

b.   Stated "[t]his opportunity allows investors the option to invest alongside the principals of Northstar;"

c.   Stated the "managers and Operator [Northstar] will personally invest up to 5% of the equity;" and

d.   Included "Equity Assumptions" that showed a "[Northstar] Co-Invest (5.00%) $389,515."

118.   Northstar sent a marketing email about the Vista Project to potential investors dated February 1, 2019, that stated, among other things, "[t]his is an opportunity to co-invest alongside" Northstar.

119.   Between February 2019 and May 2019, Northstar raised approximately $7.8 million in Common Equity from at least 67 investors.

120.   Northstar's and Watson's statements about their co-investment in the project were false and misleading. Defendants contributed no equity to the project.

121.   Defendants never informed Common Equity investors that they had not made the equity contribution set forth in the Summary.

122.   At the time they told investors in the Vista Project that they would co-invest, Defendants knew that they had made similar statements about co-investing in preceding offerings and had not made such investment. Defendants did not inform investors in the Vista that this had occurred.

xii. **Additional False and Misleading Statements Regarding Houston Project**

123.    In mid-2019, Defendants solicited Common Equity investors for a project to purchase and improve an office building in a Houston, Texas suburb ("Houston Project").

124.    Defendants prepared and distributed to potential investors a Summary for the Houston Project dated March 26, 2019. Among other things, this Summary:

      a.    Stated "[t]his is an opportunity to co-invest alongside Northstar Commercial Partners and its principals;"

      b.    Stated "[t]he managers and Operator will personally invest up to 5% of the equity;" and

      c.    Included "Equity Assumptions" that stated "[Northstar] Co-invest (5.00%) $501,614[.]"

125.    Defendants prepared and distributed to potential investors another Summary for the Houston Project dated May 23, 2019. Among other things, this Summary:

      a.    Stated "[t]his is an opportunity to co-invest alongside Northstar Commercial Partners and its principals;"

      b.    Stated "[t]he managers and Operator will personally invest up to 5% of the equity;" and

      c.    Included "Equity Assumptions" that stated "[Northstar] Co-Invest (5.00%) $407,394[.]"

126.    Northstar sent a marketing email dated April 8, 2019, to potential investors that stated, among other things, "[w]we are currently accepting debt and equity partners…." for the Houston Project and one other.

127.    Between April 2019 and August 2019, Northstar raised approximately $8.1 million in Common Equity from at least 61 investors.

128.    Northstar's and Watson's statements about their co-investment in the project were false and misleading. Watson contributed a total of $4,998 to the project. Northstar made no investment in the project.

129.    Defendants never informed Common Equity investors that they had not made the equity contribution set forth in the Summary.

130.    At the time they told investors in the Houston Project that they would co-invest, Defendants knew that they had made similar statements about co-investing in preceding offerings and had not made such investment. Defendants did not inform investors in the Houston that this had occurred.

**B.    Defendants Acted with Scienter, and Their Conduct was Negligent.**

131.    A reasonable investor would have understood from Watson's and Northstar's statements described above that Watson and Northstar would make a co-investment in the Relevant Projects in amounts reflected in the Summaries.

132.    Defendants' statements concerning their co-investment were false and misleading because neither Watson nor Northstar intended to make the co-investment that they disclosed to investors. Despite Watson's control over Northstar and knowledge of Northstar's finances and activities, the promised investments were not made. Moreover, Watson has admitted that he only had a "hope to invest [his] personal capital" and that a "myriad of factors" would influence his ultimate decision to invest, including his "ability to access capital to invest."

133.    Neither Watson nor Northstar disclosed to investors that Watson and Northstar believed their investment decisions were contingent on certain factors or what those factors were.

134.    Defendants knew or were reckless in not knowing, and should have known, that their statements concerning their co-investment were false and misleading at the time they were made.

135.    Defendants omitted to state material facts that were necessary to render their statements concerning their co-investment not misleading. These omissions include the facts that they failed to make the promised co-investment in earlier projects, and, if such factors existed, that they considered the co-investment set forth in the Summaries to be optional or discretionary and undisclosed factors might influence their decision to make the co-investment. The PPMs for each Relevant Project also omitted that Defendants would not make the investments disclosed in the Summaries.

136.    Defendants were also negligent in making these false and misleading statements because, when making these statements, Defendants failed to exercise the diligence, care, and competence of a reasonable real estate developer about the accuracy of these statements.

C.    **Information About Defendants' Co-Investment was Material.**

137.    The above misrepresentations and omissions as to Defendants' co-investment were material to investors and potential investors. Defendants' personal stake in the projects aligned investor interests with Defendants' and demonstrated Watson's confidence in the projects' prospects for success. A co-investment was also consistent with industry standards and, for many investors, a precondition to their Common Equity investments.

138.     Because of Defendants' materially false and misleading statements, and the material information Defendants failed to disclose, Defendants fraudulently offered and sold securities to fund each of the Relevant Projects.

     **D.**     **Defendants are Each Liable for The Misstatements and Omissions.**

139.     All of the misrepresentations and omissions detailed above were made in connection with the offer, purchase, or sale of securities.

140.     Northstar and Watson each made and disseminated each misrepresentation and omission detailed above using the means of interstate commerce, including email and Northstar's internet portal.

141.     Watson determined the content of, and had ultimate authority over, the marketing materials, Summaries, and PPMs.

142.     Throughout the Relevant Period, Watson acted within the scope of his apparent authority to make representations on behalf of Northstar, and did in fact make the representations described above on behalf of Northstar.

143.     As the founder, owner, and CEO of Northstar, who acted on behalf of Northstar with respect to his conduct alleged in this Complaint, Watson's scienter is imputed to Northstar.

     **E.**     **Northstar and Watson Obtained Money or Property From Their Misconduct.**

144.     Defendants each obtained money by means of the misrepresentations and omissions detailed above.

145.     During the Relevant Period, Watson and Northstar each received fee income, as disclosed in the Summaries and PPMs, for each of the Projects. These fees were funded by investor capital.

**IV.**     **Defendants Engaged in a Deceptive Course of Conduct.**

146.     As described above, throughout the Relevant Period, Defendants made false and misleading statements in eleven successive offerings for ten different projects, all designed to encourage investors to invest based on the false premise that Defendants were investing alongside other investors.

147.     Defendants established a deliberate pattern and practice in successive offerings during the Relevant Period by disseminating documents with similar false and misleading statements made with similar language, all in a similar context, in each offering.

148.     Defendants engaged in this fraudulent and deliberate course of conduct over years as they continued to pledge that they would invest in each project, despite their failure to do so in prior projects.

149.     To prolong this course of conduct, Defendants never disclosed to investors that they did not invest in a specific project, as described above, and never gave investors the opportunity to rescind their investments in light of that fact.

**V.**     **In the Alternative, Watson was a Control Person of Northstar.**

150.     Watson had control over Northstar during the Relevant Period.

151.     Watson, as founder, CEO, and sole owner of Northstar, exercised control over the management, general operations, and policies of Northstar, as well as the specific activities upon which Defendants' violations are based.

**VI.**     **In the Alternative, Watson Aided and Abetted Northstar's Fraud.**

152.     As described above, Watson engaged in fraudulent and deceptive conduct and made fraudulent false and misleading statements. Watson knowingly, or recklessly, and

negligently substantially assisted Northstar's fraudulent conduct and misstatements by engaging

in the acts and making the misstatements described in this Complaint.

## FIRST CLAIM FOR RELIEF

### Fraud—Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]
### (Against All Defendants)

153.    The SEC realleges and incorporates by reference paragraphs 1 to 152 as though

fully set forth herein.

154.    By virtue of the foregoing, from no later than 2016 through at least February

2021, Northstar and Watson, directly or indirectly, acting with scienter, by use of the means or

instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities

exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes

or artifices to defraud; (b) made untrue statements of material fact or omitted to state material

facts necessary in order to make the statements made, in light of the circumstances under which

they were made, not misleading; and (c) engaged in acts, practices or courses of business which

operated or would operate as a fraud or deceit upon another person.

155.    By reason of the conduct described above, Northstar and Watson, directly or

indirectly, violated, and unless restrained and enjoined, will again violate, Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(b)].

## SECOND CLAIM FOR RELIEF

### Fraud—Control Person Liability under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Northstar's Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5] (Alternatively, against Watson)

156.     The SEC realleges and incorporates by reference paragraphs 1 to 152, as though fully set forth herein.

157.     By virtue of the foregoing, from no later than 2016 through at least February 2021, Watson exercised control over Northstar, which, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

158.     Accordingly, Watson is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Northstar's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Fraud—Aiding and Abetting Northstar's Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5] (Alternatively, against Watson)

159.     The SEC realleges and incorporates by reference paragraphs 1 to 152, as though fully set forth herein.

160.     By virtue of the foregoing, from no later than 2016 through at least February 2021, Watson provided knowing and substantial assistance to Northstar, who, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

161.     Accordingly, Watson aided and abetted and, unless restrained and enjoined, will again aid and abet, the violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities—Violations of Securities Act Section 17(a)
### [15 U.S.C. § 77q(a)]
### (Against All Defendants)

162.     The SEC realleges and incorporates by reference paragraphs 1 to 152, as though fully set forth herein.

163.     By virtue of the foregoing, Northstar and Watson from no later than 2016 through at least February 2021, have, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) employed a device, scheme, or artifice to defraud with scienter; (2) obtained money or property by means of an untrue statement of material fact or omission to state a material fact

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

164.     Accordingly, Northstar and Watson violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FIFTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities—Aiding and Abetting Northstar's Violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)]**
**(Alternatively, against Watson)**

165.     The SEC realleges and incorporates by reference paragraphs 1 to 152, as though fully set forth herein.

166.     By virtue of the foregoing, from at least 2016 through at least February 2021, Watson provided knowing and substantial assistance to Northstar, who, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) employed a device, scheme, or artifice to defraud with scienter; (2) obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

167.     Accordingly, Watson aided and abetted and, unless restrained and enjoined, will again aid and abet, violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## RELIEF SOUGHT

**WHEREFORE**, the SEC respectfully requests that this Court:

### I.

Find that each of the Defendants committed the violations alleged in this Complaint;

### II.

Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the Defendants from violating, directly or indirectly, the laws and rules they are alleged to have violated in this Complaint;

### III.

Order that each of the Defendants disgorge any and all ill-gotten gains, together with pre-judgment interest, derived from the improper conduct set forth in this Complaint, plus post-judgment interest;

### IV.

Order that each of the Defendants pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], in an amount to be determined by the Court, plus post-judgment interest;

### V.

Grant such other relief as this Court may deem just or appropriate.

## JURY DEMAND

The SEC demands a trial by jury on all claims so triable.

Respectfully submitted this 22nd day of August, 2022.


By:      /s/ *Terry R. Miller*_____
         Terry R. Miller
         Attorneys for Plaintiff
         UNITED STATES SECURITIES AND
         EXCHANGE COMMISSION
         Denver Regional Office
         1961 Stout Street, 17th Floor
         Denver, Colorado 80294
         (303) 844-1041
         millerte@sec.gov